OPINION.
Drake, Ch. J.,
delivered the opinion of the court:
These actions are brought to recover compensation for carrying United States mails in 1861, under contracts therefor entered into by the respective claimants with the Post-Office Department, each for the term of four years, and three of them dated in 1858 and one in 1859. As the amount claimed in each case is less than $3,000, and therefore no appeal can be taken by either of the claimants, we make no- finding of facts, but state the facts in each case, so far as necessary, in the opinion.
The cases are so similar in their main features, and so dependent on the same statutory provisions that were considered in Hukill's Case (16 C. Cls. R., 562), that we cannot better show the general points involved in them than by presenting portions of the opinion of the court in that case, as follows:
In tlie Smidry civil appropriation act of Mm'ch 3,1877 (19 Stat. L., 344, 362, ch. 105), is the following provision:
“That the sum of §375,000, or so much thereof as may he necessary, he *184 appropriated to pay the amount due to mail contractors for mail service performed in the Stare of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Texas, Tennessee, Virginia, and West Virginia, in the years 1859, 1860, 1861, and before said States respectively engaged in war against the United States; and the provisions of 3480 of the Revised Statutes of the United States shall not be applicable to the payments therein authorized: Provided, That any such claims which have been p>aid by the Confederate States Government shall not be again paid.”
*•#*#**#
But for the proviso to that section we should not probably hesitate in rendering a judgment in the claimant’s favor for the amount standing to Ms credit on the Auditor’s books; but that proviso, in connection with another matter, presents an obstacle which we do not see our way clear to overcome.
In our opinion, the effect of the proviso is to require from the claimant at least some evidence to raise a reasonable presumption that the claim was not paid by the so-called Confederate States Government. On 'that point the claimant, at the trial, offered no evidence whatever, though his petition avers that the claim was not paid by that government, or by any government, or pretended government, of any State.
Not only is there an entire absence of any such evidence, but we have had brought to our notice two acts passed by the Congress of the Confederate States, which seem to us to have an important bearing on the decision of this case. We present them here in full.
"AN ACT to collect for distribution tlio moneys remaining in tbe several Post-Offices of the Confederate States at the time the postal service was taken in charge by said Government.
“The Congress of the Confederate States of America do enact, That it shall be the duty of the Postmaster-General to collect all moneys due from the several postmasters within the Confederate States, and which they had not paid over at the time the Confederate States took the charge of the postal service, and the several postmasters are hereby required to account to the General Post-Office of this Government under the same rules, regulations, and penalties that were prescribed by the law under which said moneys were received.
“Sec. 2. The moneys so received shall be kept separate and distinct from the other funds of the Post-Office Department, and shall constitute a fund for the pro rata payment of claims for postal service which accrued before the Postmaster-General took charge of the postal service in the States respectively comprising this Confederacy, as may hereafter be provided.
“Sec. 3. It shall be the duty of the Postmaster-General to make proclamation, that all persons who are citizens of the Confederate States of America, and who may have rendered postal service in any of the States of this Confederacy, under contracts or appointments made by the United States Government before the Confederate States Government took charge of such service, shall present their claims to his department, verified and *185 established according to such rules as he shall prescribe, by a time therein to be set forth not less than six months, and requiring the claimant to state, under oath, how much has been and the date of such payments, on account of the contract or appointment under which said claim occurred, and what fund or provision has been set apart or made for the further payment of the whole or any portion of the balance of such claim, by the Government of the United States, or of any of the States; and they shall also state, on oath, whether they performed fully the service according to their contracts or appointments during the time for which they claim pay, and if not, what partial service they did perform, and what deductions have been made from their pay, so far as they know,.on account of any failure, or partial failure, to perform such service; and the Postmaster-General shall, as soon as he shall have collected such moneys from said postmasters, and ascertained the amount of claims against the Post-Office Department and the amount received respectively by the claimant as aforesaid, and the provisions, if any, for future payment, make a report of the same, so that future action may be taken thereon as respects the distribution.
“ Sue. 4. All claims for postal service required to be presented by this bill shall be barred as against this fund, unless presented within six months after the proclamation of the Postmaster-General shall have been made.
“Approved August 30, 1861.”
"AN ACT to provide for the payment of sums ascertained to be due for postal service to citizens of the Confederate States by the Postmaster-General.
“The Congress of the Confederate States of America do enact, That the Postmaster-General of the Confederate States do proceed to pay to the several persons, or their lawfully authorized agents or representatives, the sums respectively found due and owing to them for postal service rendered in any of the States of this Confederacy, under contracts or appointments made by the United States Government, before the Confederate States Government took charge of such service, as the said sums have been credited and ascertained by him under the provisions of an act entitled ‘An act to collect for distribution the moneys remaining in the several post-offices of the Confederate States at the time the postal service was taken in charge by said Government,’ ai>proved the thirtieth day of August, 1861; but the sums authorized by this Act to be paid are only the balances found due after all proper deductions shall have been made on account of previous payments made by the United States, or any of the States, or of available provisions made in whole or in part for such jjayment by said Government, or of any of the States, and after making all proper deductions for failures or partial failures to perform the service according to their several contracts or appointments during the time for which they claim pay: Provided, That the i> revisions of this Act shall only extend to loyal citizens of the Confederate States.
“Approved, September 27, 1862.”
From these acts it appears, 1. That all United States postmasters in the insurrectionary States were, as early as August 30, 1861, required to pay over to the General Post-Office of those States all moneys of the United *186 States which they had not paid over to the United States at the time the Confederate States took the charge of the postal service: 2. That the postmaster-General of the Confederate States was hy proclamation to notify all contractors with the United States for the transportation of mails in the insurrectionary States, who had rendered postal service in any of those States before the Confederate States Government took charge of such service, to present to him, within six months after his proclamation had been made, their claims for postal service so rendered: 3. That as soon as he should have collected those moneys, and ascertained the amount of such claims, he should make a report to the Confederate Congress on the subject, “so that future action may he taken thereon as respects the distribution ” of the moneys; and 4. That by the said Act of September 27,1862, the Confederate Postmaster-General was required, not to distribute those moneys pro rata among the United States contractors whose claims, of the above description, he found to be due and owing, but to proceed to pay to them, or their lawfully authorized agents or representatives, the whole amount of those claims.
In our judgment, the defendants, in any such case as this, are entitled to the benefit of the presumption that every United States mail contractor, on routes within the insurrectionary States, who came within the terms of those two laws, did receive full payment from the insurrectionary government of all that had been earned by him under his contract, prior to the time when the State in which his route lay declared its secession from the Union.
As before intimated, the claimant has not, in the least degree, attempted to meet and rebut that presumption, though the necessity for doing so is plainly indicated on the face of the very statute under which he seeks to maintain this suit.
Such being the case, nothing is left us but to dismiss his petition, and it is dismissed.
We reproduce here this opinion, because it bears directly on all the above cases, and because we wish, in immediate connection with it, to present some other views, which must enter into the consideration and decision of all cases of this description to come before us, of which we understand there are quite a large number.
It will be observed that, in that opinion, only one question of law was decided, namely, that under the proviso of the statute of March 3, 1877, the defendants are entitled to the benefit of the presumption that every United States mail contractor, on routes within the insurrectionary States, who came within the terms of the two acts of the Confederate Congress, did receive full payment from the insurrectionary government of all that had been earned by him under his contract, prior to the time when the State in which his route lay declared its secession from the Union.
*187 We adhere to this proposition, as a matter of law, to be applied to all oases of this character.
The presumption, however, to the benefit of which the defendants are entitled, is conclusive only in the absence of all opposing evidence, and may be repelled by sufficient evidence; and if so repelled the obstacle to the claimant’s recovery is removed.
When, therefore, opposing evidence is given, the case is before ns as a quasi jury, and we are simply to decide whether the evidence is sufficient to satisfy ns that the presumption is repelled. The matter then comes into the region of presumptions of fact ; which are mere arguments, to be judged by the common and received tests of the truth of propositions and the validity of arguments; and in regard to which the whole matter is free before the jury, unembarrassed by any considerations of policy or convenience, and unlimited by any boundaries but those of truth, to be decided by themselves, according to the convictions of their own understanding. (1 G-reenleaf on Evidence, § § 44, 48.)
With this preliminary statement we proceed to consider the several cases.
MAKE M. HUKILL’S CASE
is the same in every particular, except one, that was decided by that opinion. His petition was then dismissed because there was an unrebntted presumption that he had been paid by the Confederate States Government for carrying the mails between January 1, 1863, and May 6, 1861. A new trial was granted him that he might have an opportunity to rebut that presumption. The only evidence he now offers, for which he claims that effect, is, that he was, on the 28th of December, 1863, at Sugar Loaf Valley, in Arkansas, enrolled in Company B., Eighteenth Regiment of Iowa Volunteers, to serve three years or during the war, and was, on the 6th of January, 1864, at Fort Smith, Arkansas, mustered into service as a recruit in that com-any, to serve for that term; and did serve until July 20, 1866, when he was mustered out of the service.
The sole question raised by these facts is, whether they so far rebut the presumjition which was fatal to his case on the former hearing as to throw upon the defendants the burden of proving that he was in fact paid by the Confederate States *188 Government for carrying the mails during theperiod in question. We are of the opinion that they do not.
Between the date of the first of the above acts of the Confederate Congress and that of his enlistment in the Union Army, a period of two years and four months elapsed. That act invited him to present to the Postmaster-General of the Confederate States his claims for postal service rendered to the United States before the Confederate States toot charge of such service. The war made it impossible for him, a citizen of an insurrectionary State, to obtain payment of that claim from the United States. The fact of his contracting to carry the mails for $700 a year would seem to indicate that he was not in circumstances of pecuniary independence, and that therefore he would naturally desire to obtain payment of his claim from the only source of payment then open to him, the Confederate authorities. Is it reasonable, under these circumstances, for us to presume that he made no effort to obtain payment from those authorities ? We think not.
But further: Between the date of the second of the above cited acts of the Confederate Congress and that of his enlistment in the Union Army, a period of fifteen months elapsed, within which, so far as appears, it was in his power to have obtained from those authorities payment of his entire claim. Is it at all probable that he made no effort to avail himself of that opportunity? We think not.
We therefore hold that this claimant’s case is in no better condition now than when tried before, but rather worse; for we gave him opportunity to fortify it, and he has failed to do it. His petition, therefore, must be dismissed.
WILLIAM A. WYATT’S CASE.
This claimant had two contracts with the Post-Office Department for carrying the mails; one over route No. 7900, between Lebanon, Arkansas, and Forsyth, Missouri, at $319 per annum; the other over route No. 7934, between Burrowsville and Dover, Arkansas, at $299 per annum.
Under the former contract he carried the mails from January 1 to April 30,1861, and under the latter from January 1 to March 31,1861; for which services he has not been paid by the defendants.
*189 The claimant offers the evidence of two witnesses to repel the presumption of his having been paid by the Confederate States Government for those services.
One of those witnesses is the ciaimant’s brother-in-law. Without going into a recapitulation of his evidence, it is enough to say that he discredits himself by his contradictory statements. He swears, in one place, that the claimant never carried the mails for the Confederate Government after he stopped carrying them for the Hnited States; and in another place he says that the claimant carried the mails down to about the last of the year 1861 or the first of the year 1862 (which was seven mouths after the United States ceased to have any connection with, and the Confederate States Government had entire control of, those routes); and then stopped carrying them because he received orders from the latter Government to enter into bond for the carrying of those mails, which he refused to do.
In our opinion these inconsistent statements are not reconcilable with truth, on any other hypothesis than that the witness did not know that, in the last seven months of 186 L, the postal service in Arkansas was in the hands of the Confederate States Government, but supposed it to have then been under the control of the United States. But during that year the witness resided in Arkansas, and must have known of the attempted secession of that State, and of the war then in progress, and could not on any reasonable supposition have been ignorant of the fact, so likely to have been known to all the inhabitants of that State, that what postal service there was there after June 1,1861, was the postal service of the Confederate States. We deem it wholly justifiable to assume that he did know that fact. His contradiction of himself, therefore, is without explanation or palliation, and in our view is sufficiently important to require us to put aside his testimony entirely, as we do.
The other witness was, during the first two years of the war, Confederate States postmaster at Burrowsville, Arkansas, one of the termini of route No. 7934. From him we might reasonably expect straightforward and reliable statements, but he does not appear in a much better light than the preceding witness. (He testifies that claimant continued to carry the mails on said routes down to or about the last of 1861 or the first of 1862; and yet, immediately afterward, says that he had no rec *190 ollection of ever having seen claimant carry the mails on said routes for the Confederate Government; and that if he ever carried them at all after the Confederate Government took charge of the postal affairs the witness had no recollection of it, and does not think he did. In view of the official relations of this witness to the postal service, we deem it impossible that the latter part of these statements could have been true, and that he must have known it not to have been true. We therefore give no weight to his testimony.
Aside from the evidence of these two witnesses there is nothing in the case to repel the presumption that the claimant Wyatt was x>aid by the Confederate States Government, and his petition must therefore be dismissed.
josephus -Wallace’s adMinistratob’s case.
Josephus Wallace had a contract with the Post-Office Department for carrying the mail over route No. 5048, between Washington and Portsmouth, North Carolina, via Ocracoke, at $750 x>er annum, from July 1, 1859 to June 30,1863; under which he carried the mail from January 1,1861, till the 20th of May following, when the State of North Carolina declared her secession from the Union; for which service he was not x>aid by the United States.
Though the claimant took the depositions of five witnesses, we have looked in vain for any statement in them calculated to rebut the xiresumption which we apply to all these cases. On the contrary their testimony seems rather to strengthen that presumption. One witness says that Wallace was “as good a rebel as any of us”; and others say that, without interruption, he continued, after North Carolina’s ordinance of secession, to carry the mail over that route for the Confederate States Government. In addition to this, there was produced before us in evidence an original contract between Wallace and the Confederate States, for carrying the mails over that route from June 1, 1861, till June 30,1863, the day of the termination of his contract with the Post-Office Department, and stipulating for the same service and compensation as was stipulated for in that contract.
That Wallace should- thus have entered into dealings with the Confederate States Government, and that without hesita *191 tion or delay, strengthens m our minds the presumption of his having been paid by that Government for the precedent service under his contract with the United States. We can, therefore, do no less than dismiss his petition.
JOHN EAHLICNER’S CASE.
This claimant had a contract for carrying the mail over route No. 8740, between Paris and Warren, Texas, at $490 per annum, from July 1, 1858, to June 30,1862. He is credited on the books of the Post-Office Department with $117.80, for service rendered up to March 31,1861.
To repel the presumption of his having received payment from the Confederate States Government for the service prior to June 1,1861, he took the depositions of two witnesses, on twenty-nine written interrogatories framed here by his attorneys. No cross-interrogatories were sent by the Assistant Attorney-General, nor was there, when the depositions were taken, any oral cross-examination.
Before proceeding to consider the bearing of those depositions on the case, there is one matter connected with them which is noticed in the brief of defendants’ counsel, and which we should deem it our duty to comment upon even if it had not been so noticed. In Shrewsbury’s Case (9 C. Cls. R., 333), this court took occasion to say: u If there is any one matter concerning which more than another a court should exercise extraordinary vigilance, it is in regard to the integrity of the depositions which are to be the basis of its judgment. Especially should this be so in this court. And if in relation to such we should make any discrimination in vigilance, it should be as to depositions taken on behalf of claimants; for, ordinarily, the Government labors under a comparative disadvantage in getting testimony. While claimants know all about their witnesses, and what they may be expected to testify, the officers of the Government must, from necessity, be much less fully and accurately informed in that respect.”
We repeat this language in the present connection with a purpose; for the circumstances seem to us to justify it.
As before remarked, the two depositions were taken under twenty-nine written interrogatories. We have examined the answers written down as having been given by each witness, *192 and find that to twelve of the interrogatories their answers are verbatim the same, and that to thirteen others they are absolutely identical, with the exception of a word or two omitted or inserted, the omission or insertion of which does not in the least change the meaning.
We cannot but regard this as extraordinary. No member of the court has ever known of a like instance. We do not hesitate to say, in view of the fact that the roles of this court require that11 when a deposition is taken upon written interrogatories, neither * * * the claimant, his agent or attorney, nor any other person, shall be present at the examination of the witness,” such identity of answers casts a suspicion, if not upon both depositions, at least upon the one last talten.
Waiving any further comment on this matter, we proceed to inquire into the force and effect of the statements of the witnesses.
Bach of them says that the claimant “ carried the mail all of 1801, and until he was stopped by the Confederate Government; that he did not carry the mail under the Confederate Government, and that he only carried it under his contract with the United States Government.”
Were this all the evidence before us, it might possibly be considered sufficient to prove those facts for what they are worth. But, unfortunately for the verity of those statements, there was put in evidence on behalf of the defendants an original paper purporting to be a contract between the claimant and the Confederate States Government for carrying the mail over the very route and at the very rate of compensation specified in his contract with the United States, and covering the period of time from June 1, 18G1, to June 30, 1862.
The authenticity of this document is clear to us by a comparison of the name of the claimant signed thereto with his name signed to the power of attorney filed in this court authorizing this suit, and also with his name subscribed to the affidavit verifying his petition.
What is the effect of this paper 1 It is twofold: 1. It proves the falsity of material statements made by the witnesses selected by the claimant himself to make out his case, and thereby destroys their credibility; and 2. It proves that the claimant deliberately procured them to swear that he did not carry the mail for the Confederate States Government, when, what *193 ever may have been their belief on that point, he lenew that that statement was utterly false.
• This is enough. The presumption of the claimant’s having been paid by the Confederate States Government for carrying the mails prior to June 1,1861, is not in the least degree repelled ; and his petition is dismissed.