Scofield, J.,
delivered the opinion of the court:
February 1, 1861, ’the United States was indebted to the claimant’s intestate for carrying the mail between San Augustine and Marshall, in the State of Texas, in the sum of $965.43.
In the Sundry Oivil Appropriation Act of March 3, 1877 (19 Stat. L., 362), is the following provision :
“ That the sum of $375,000, or so much thereof as may be necessary, be appropriated to pay the amount due to mail con *275 tractors for mail service performed in the States of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Texas, Tennessee, Virginia, and West Virginia, in the years 1859, I860,1861, and before said States respectively engaged in. war against the United States; and the provisions of section 3480 of Revised Statutes of the United States shall not be applicable to the payments therein authorized : Provided, That any such claims which have been paid by the Confederate States Government, shall not be again paid.”
At an early day after tlie passage of this act the Secretary of the Treasury issued an order that no payments should be made out of that appropriation until all claims covered by its terms should have been received and adjusted; and if the appropriation should prove insufficient, they should then be paid pro rata. In consequence of this order no claims were adjusted within two years after the date of the act, and the appropriation was therefore covered into the Treasury, under the requirement of section 5 of the Legislative, Executive, and Judicial Appropriation Act of June 20, 1874 (18 Stat. L., ch. 328, p. 85), which provides “ that from and after the 1st day of July, 1874, and of each year thereafter, the Secretary of the Treasury shall cause all unexpended balances of appropriations wliich shall have remained upon the books of the Treasury for two- fiscal years to be carried to the surplus fund and covered into the Treasury.”
Prior to the passage of this act the claim was barred from prosecution in this court by section 1069 of the Revised Statutes.
The defendants contend that the court derives no jurisdiction by virtue of this appropriation.
The court has had occasion to consider and rule upon that question several times, but as counsel, with commendable zeal in behalf of the Government, have again pressed it upon the attention of the court, we have gone over our former rulings and considered the question anew.
In Hukills Case (16 C. Cls. R., 562), Chief-Justice Drake, delivering the opinion of the court, said :
“ This covering of the appropriation into the Treasury deprived the officers of the Treasury Department of any power to pay this claim, and consequently the claimant is wholly without recourse if he has it not in this court.
“ On behalf of the defendants it is contended that he has no *276 right to payment, except out of that particular appropriation which being- no longer available, he has no legal standing as a creditor of the Government, here or elsewhere. We do not concur in that view.
“An appropriation by Congress of a given sum of money, for a named purpose, is not a designation of any particular pile of coin or roll of notes to be sot aside and held for that purpose, and to be used for no other; but simply a legal authority to apply so much of any money in the Treasury to the indicated object.
“ Every appropriation for the payment of a particular demand, or a class of demands, necessarily involves and includes the recognition by Congress of the legality and justice of each demand, and is equivalent to an express mandate to the Treasury officers to pay it. This recognition is not affected by any previous adverse action of Congress ; for the last expression by that body supersedes all such jmevious action.
“ When, therefore, Congress made the appropriation in question, it was as if the United States said to this claimant, and every other of like kind : ‘ The legality and justice of paying you for the service you rendered in carrying the mails under your contract,with the United States in 1859,1860, or 1861 are recognized; and if you were not paid by the Confederate States Government for so much of that service as you rendered before the State in which it was rendered “engaged in war against the United States,” you can on application to the proper officers at the Treasury get whatever amount may be legally ascertained to be due you for that service; and in order to remove the obstacle to your payment which section 3480 of the Be vised Statutes has heretofore interposed, we declare that that section shall not apply to your case.’
“ So, in effect, by that appropriation, said Congress to those contractors, well knowing when it did so that, unless it so said, there was no possible way for them to get payment through executive action, and that their right to invoke the aid of this court had long before been barred by existing law.
“Did Congress intend that that recognition of the legality and justice of those claims should be annulled unless the parties succeeded in getting payment before the end of the two years? We think not. Beyond douot, the authority to take the money out of the Treasury for such payment under that appropriation lapsed at the end of the two years; but the right of the parties to assert and maintain their claims, once recognized and affirmed by Congress, became thenceforth, in virtue of that act, an acknowledged right against the United States which this court is bound to take cognizance of under its general power ‘ to hear and determine all claims founded upon any law of Congress.’”
*277 In Huffman’s Case (17 C. Cls. R., 55) tbe court (Judge Nott giving tbe opinion) said:
“ It was said on tbe argument that tbe decision in the Ludington Case (15 C. Cls. R., 453) decides this; and reference was made to tbe second section of the Act \6th Jime, 1874 (l Supp. Bev. Stat., 37), and to tbe fourth section of the Aot 14th June, 1878 (id.,,350), as being substantially the same in effect, the former governing the Ludington Case and tbe latter this. But the distinction between tbe two cases lies behind the operation of these statutory pro\ isions, and is, we think, a broad one.
“In Ludington’s Case the executive officers were without authority to pay the class of claims to which it belonged, and their duty was limited to reporting the facts connected with them to Congress, there to await legislative action. The claimant founded his suit on such a report, upon the theory that it was an award. The court held that the provision of the Act 16th June, 1878 (1 Supp. Bev. Stat. § 2, p. 37), requiring the consideration of Congress upon the reports of the officers charged with the examination of such claims, took away whatever character of an award suchreports previously might have had. In this •case Congress validated a class of claims, appropriated money to satisfy them, and directed the Secretary of the Treasury to examine and pay them. The Secretary did not examine them, and this suit is not founded upon any report of his. The fact that he did not pay the claims vv.hiletlie appropriation remained under his control did not extinguish the parties’ rights ; and the general statutory provision in the Act 1878 (1 Supp. Bev. Stat., 350), directing the accounting officers to coutinue to examine claims 1 under appropriations, the balance of which may have been exhausted or carried to the surplus fund,’ and directing the Secretary to report the amount due to each claimant to the Speaker of the House to be laid before Congress ‘ for consideration,’ does not affect the causes of action, nor change their character, nor remove them from the jurisdiction •of this court. In a word, the decision of the court, in Ludington’s Case Avas that the alleged cause of action had never become complete ; and the ruling of the court in this case is that a perfected right of actiou is not taken away by the lapsing of an appropriation under provisions of law which are intended to regulate the power and duties of the accounting officers.”
In Mordecai’s Case (19 C. Cls. R., 11) the court, by Judge Biehardson (now chief justice), said:
“ We have held in several cases that mail contractors described in that act may recover for ‘mailservice performed’ in the States therein named during the years 1859,1880, and 1801, notwithstanding the period of six years’limitation had expired before the passage of the act, on the ground that Congress had revived and renewed the cause of action, as of the date of the *278 passage of the act by thus appropriating and providing the means of payment.”
In many other cases involving the same question the court has assumed jurisdiction. (Hukill et al., 18 C. Cls. R., 181; George’s Case, ib., 432; Wray’s Case, 19 id., 154; Chesapeake and Ohio R. R. Co., ib., 300; Chesapeake and Ohio R. R. Co., ib., 49; Nashville, Chattanooga, and St. Louis Railway, ib., 476.),
The latter case was appealed to the Supreme Court and the judgment of this court affirmed, without questioning the jurisdiction. (113 U. S. R., 261.) It does not appear, from the report of the case, that the question of jurisdiction was discussed by counsel.
The particular question presented to and decided by the court was whether the claims had been included and settled in a certain decree rendered in a former suit in equity between the parties, and which decree had been set up by the Government as a defense to the claim. The court held that it was so included, and that the' decree was therefore a bar to a suit by the railroad company for this mail service.
The court had all the facts before it, showing that the claim was entirely based upon the appropriation act of 1877, and could not have decided that it was included in the decree without taking notice of what the claim consisted, and, thus taking notice, consenting to the jurisdiction assumed by this court.
Jordan’s Case (19 C. Cls. R., 108) is very similar in its facts to the pending case, and involves the same question of jurisdiction. In that case the act authorized and directed the Secretary of the Treasury to refund to the persons named certain taxes. Outside of this act these persons had no legal claim upon the Government. Part only of the taxes was refunded by the Secretary, and the beneficiaries of the act brought suit in this court to recover the balance. The court took jurisdiction and gave judgment for the claimants. The case was appealed to the Supreme Court and there affirmed. (113 U. S. R., 418.)
All differences in the facts,of the two cases are in favor of the present suit. In that case the Secretary was directed'and required to pay ; in this thore is a simple appropriation, without specific directions as to the mode of payment. In that case the claimants had never been clothed with legal rights *279 against the Government; in this a legal right, based upon contracts, once existed, but had been lost by lapse of time.
That the parties were named in the appropriation act in the one case and not in the other can make no difference, because in the latter case the class of beneficiaries is definitely described.
“ All claims founded upon any law of Congress” constitute one branch of our j urisdiction. That an appropriation by a law of Congress of a definite sum of money for the relief of a specified class of claimants is, with some few exceptions, embraced! within these words we have no doubt.
Another subject of controversy originates in the proviso to the appropriation of 1877, “ that any such claims which have been paid by the Confederate States Government shall not be again paid.”
The Confederate Government, in an act passed August 30, 1861, directed their postm aster-gen eral to collect from United States postmasters within the Confederate States all moneys due and not paid over at the time that Government took possession of the postal service (June 1, 1861), and holl the same as a fund for the pro rata payment of claims for postal service which accrued before that date.
The act also directed the postmaster-general to make proclamation, calling upon all such claimants to present their claims, duly verified, within six months from the date of the proclamation. The act further provided that all such claims not presented within the six months should not be allowed to share in this fund.
A second act, dated September 27, 1862, directed the postmaster-general to pay all such claims ascertained by him to be-due to loyal citizens of the Confederacy.
In pursuance of these acts $502,017.19 was paid out upon such claims prior to September 30, 1863, but to whom does not appear.
In Hukill’s Case (16 C. Cls. R., 562), and in other following-cases, the court held that this action on the part of the Confederate Government raised the presumption that all claims which came within the requirements of these acts were paid. The-court still adheres to that opinion. This ruling imposes upon the claimant the difficult task of proving that he has not been, paid.
The Confederate records by which the question of payments- *280 might be, readily -settled are not in the possession of, nor accessible to, either party.
The claimant contends that the following facts, as found by the court, rebut the presumption of payment and throws upon the defendants the burden of proof:
1. Said Baker was a native of the State of New York, and at first opposed to secession.
2. He did not continue to carry the mail for the Confederate States after Texas seceded.
3. Although a young man, and liable to military service, he kept out of the Confederate army until some time in 1863, when he enlisted as a private, and in the early part of 1864 was killed in battle.
4. His friends, neighbors, and creditors interested in his affairs never knew or heard of his making application for or receiving any compensation from the Confederate Government, nor did it come to their knowledge that any provision had been made for such payment.
It does not appear at what time the postmaster-general issued this proclamation; but, presuming that, it was attended to very soon, the time within which claims could be presented •expired about March 1, 1862. During this time we may well infer from the above facts that the claimant’s intestate was not in sympathy with the Confederate cause, and if he knew of the •existence of the law would not attempt to take advantage of it. It could not have been known, at that time, whether any ■considerable sum could be collected from the postmasters, nor how large would be the demands upon it. As it was to be distributed pro rata among all claimants, he may well have concluded that it was scarcely worth while to make application. He would, probably, prefer to hold his claim against the United States, the payment of which was not then prohibited, than to take his chance in such an uncertain fund. Besides, there was considerable probability .that his claim, if presented, might be rejected, because at that time he was not understood to be loyal to the Confederate States.
There'is also a strong probability that he never heard of the provision for the payment of these claims within the time allowed for presenting them. As he did not carry the mail after Texas seceded, he probably gave little attention to what what was being done in regard to postal matters.
*281 The fact that, a year afterwards, he fell in with the prevailing sentiment around him and was induced to enter the Confederate service does not seriously militate against these inferences. It is easy to understand how a man in common life may have stoutly opposed secession, and yet, as the war progressed, as battles were fought, and as the martial spirit, steadily rising in intensity, overspread the whole country, might gradually surrender to the fierce enthusiasm of an overwhelming majority and, through coercive influences, even volunteer in a service that at heart he did not approve.
In the case of Hukill et al. (18 C. Cls. R., 187) this court, in reviewing its former decision relative to the presumption of payments, said: “The presumption, however, to the benefit of which the defendants are entitled, is conclusive only in the absence of all opposing evidence, and may be repelled by sufficient evidence, and, if so repelled, the obstacle to the claimant’s recovery is removed.”
The presumption of payment herein involved is of the same character as the presumption of payment of a bond, mortgage, or judgment after the lapse of twenty years, and may be rebutted by the same kind and degree of evidence.
The latter presumption of payment may be rebutted by proof of “ the debtor’s poverty or circumstances making it inconvenient to the parties to pay or receive the debt, * * * or any other facts from which non-payment can be inferred.” (Wharton’s Evidence, §1364.)
G-reenleaf on Evidence, volumn 1, section 39, says:
“The presumption of judgment may be repelled -by any evidence of the situation of the parties or other circumstances tending to satisfy the jury that the debt is still due.”
In Grantham v. Canaan (38 N. H., 268) the court says :
“ The presumption of payment is liable to be rebutted and overcome by proof of any facts and circumstances the legitimate tendency of which is to render it more probable than otherwise that payment has not in fact been made.”
This decision is often cited with approval, both by courts and commentators.
In the judgment of the court the facts above recited are sufficient to rebut the presumption of payment, and so it does not appear that the claim has been paid by the Confederate States.
The further question presented by counsel, as to the ti me when *282 the State of Texas “ engaged in war against the United States/' has, under the facts found, ceased to be a factor in the case. Texas passed the ordinance of secession February 1, 1861, and it is not pretended that any war existed prior to that time. It appears that the claimant’s services terminated within a few days after that date; and, owing to the uncertainty as to the number of days, his compensation has been reckoned only to February. 1, 1861.
Judgment will be entered in favor of the claimant in the sum of $966.43.